Case number 243483, W6 Restaurant Group Ltd at all v. Isabella Guzman at all, or arguments not to exceed 15 minutes per side. Ms. Kelly, you may proceed for the appellant. Thank you. Thank you, Your Honors. May it please the Court. My name is Melissa Kelly and I represent the appellants in this case. I've reserved three minutes of my time for rebuttal. Fine. The consequences in this case are significant. We are here today because the SBA ignored Congress' mandate about how to process applications for funds from the Restaurant Revitalization Fund. The SBA also dawdled when confronted with fraudulent applications so that the covered period ended and the Fiscal Responsibility Act was enacted before the effort to recover funds was complete. Allowing the District Court's decision to stand will result in an agency being allowed to violate Congress' clear instructions and deprive deserving applicants of funds that Congress intended them to receive. The question before the Court today is whether the District Court erred when it dismissed the appellant's third amended complaint, particularly without allowing appellants to engage in jurisdictional discovery that was aimed at responding to the government's arguments about subject matter jurisdiction. If the question is a legal question, would there need to be jurisdictional discovery? If it were purely legal, yes, but it was not purely legal. There was certainly evidence of some dispute about how the SBA was treating the end of the covered period, the enactment of the FRA, the Fiscal Responsibility Act, and that's in the form of the OIG reports that we attached to our jurisdictional discovery motions. But, I mean, the District Court seemed to think that those disputes were not material. I mean, if, you know, I mean, the covered period is spelled out in the statute, and that seemed to be one reason for the District Court here to think your claim was moot, right? You're right, Your Honor. The District Court did seem to think that that was irrelevant. Obviously, we disagree, and we disagreed because the SBA had been told by the OIG there were fraudulent applications. You need to go collect the money, and, in fact, on page 16, which I think is page ID 853 in the record, the SBA, excuse me, the OIG said to the SBA, if you don't collect these fraudulently awarded funds, there will be money to be redistributed to applicants. That report was issued after the Fiscal Responsibility Act was enacted, after the close of the covered period, and the SBA agreed to accept those recommendations. So, we obviously disagree with Judge Brennan's decision that all of that was irrelevant, because it seemed that the agency that was tasked with implementing and operating the RRF was acting differently. Yeah, but we're going to look to the statute rather than what the SBA thinks the statute means. I mean, the statute is what's binding on us here. And that does seem to define these things pretty clearly. The statute did not contemplate what happened with the Restaurant Revitalization Fund. Congress's instruction in ARPA was clear. Process these applications in the order in which they're received. The applicants who are eligible, eligible entities will receive their funds, and they have to use them by the end of the covered period. That didn't happen here, because the SBA violated Congress's instructions. And it said, we're going to set more complicated applications aside, and we're going to do the simpler ones first. And so applications like, you know, more complicated applications like some of my clients were set aside, and they just sat, and they were never decided. Assuming that you're right on the facts as you've described them, doesn't the statute say that Congress has permanently rescinded the unobligated balances as of a date certain in 2023? And so why isn't that the binding statute that we are applying here? It's sort of the same problem that I've been talking about, Your Honor. What the FRA says is that it has permanently rescinded unobligated balances. And so what our dispute came down to in the district court in a large part was, what does unobligated mean? And that sort of goes back to what's happening in the OIG reports, where after that statute was enacted, two reports came out that said there's fraud, go and collect it. One specifically said, if you go and collect it, there's money that you can give to other applicants. It doesn't say there's money that you can return to the Treasury. It says you can give it to other applicants. And that creates a dispute about what unobligated means. And that was part of why we wanted the jurisdictional discovery, was to figure that out. But where would we go to understand what a word in a statute means? Wouldn't we go to the statute itself, to the dictionaries that apply at that particular time? To maybe, if we believe in legislative history, to the committee reports and so forth, as opposed to saying that we need to have jurisdictional discovery. And isn't the plain meaning of unobligated balances here to preclude any other issuance of however wrongfully withheld payments were? Certainly, Your Honor. And I actually appreciate that question very much. Because, so the statute itself, the FRA does not define unobligated. The government offered a definition. Our response to that was, look at everything that's going on. That could show that unobligated in this instance does not have the same definition that the government picked, or that Judge Brennan picked. And if you consider the Fiscal Responsibility Act in the context of ARPA, and ARPA clearly expressed an intent from Congress. It expressed at least two different kinds of intents that I can talk about, just from the statute itself. ARPA said, process applications in the order in which they were received. The SBA didn't do that. ARPA also said, and ARPA was enacted in May of 21. ARPA said, for funds, or excuse me, expenses incurred from February of 20 until the end of the closed period, a restaurant could use funds received under the IRF for certain enumerated expenses. So what that shows is Congress's intent of broad relief, even backward looking, to expenses that were incurred before the ARPA was even enacted. And it said, and that relief should be rewarded with respect to order of application. So, and then what happens? The SBA doesn't do that. And then it gets recommendation from the OIG to go and report, excuse me, to go and collect fraudulently obtained funds. And it's told if you do that, there will be funds to collect. And all of that is happening in the background about this, at the same time that the FRA says unobligated. So while frequently a dictionary definition will help, will aid the court in the interpretation of a statute, we think the judgment erred here because there was so much going on that suggested that the government's definition of unobligated was just not correct. Did the OIG purport to interpret the term unobligated in its report? It did not, Your Honor. So we're just extrapolating then? I'm sorry, what's that? I said we're just extrapolating then. I mean, it seems like you're asking us to take the OIG's report to somehow gloss on to the definition of unobligated. Which, you know, even if we were in a world of deference, would beg the question of whether the OIG even interprets the word unobligated to mean that. But if the OIG itself and its report doesn't purport to be defining the term or interpreting the language in the statute, then we're really, you know, pulling from one place and pulling from the other and putting them together. You're absolutely correct, Your Honor, that the OIG reports do not discuss unobligated and they don't define it. But they were both issued after the Fiscal Responsibility Act was enacted. So what about the problem of the covered period and that the covered period has ended? I'm sorry, Your Honor, I apologize. I was born with hard hearing and it's just gotten worse. What about the problem of the covered period and that the covered period has ended? So how could anything be paid to your clients given that the covered period has ended? Certainly. So the covered period applied to eligible entities that received a grant under the RRF. That's not my clients. We haven't received it yet. And interpreting the phrase covered period in a way that goes against Congress's intention, that an applicant who applied has an application that should be considered in order that it was received, and not because of the SBA's mismanagement, won't, including entities like my clients in eligible entity who received funds during the covered period, is inconsistent with Congress's intent. And this court actually can exercise, well, the district court can exercise its equitable powers, and we ask for equitable relief in our complaint, it can exercise its equitable powers to say, find funds, award funds. The Houston case that we cite in our briefing talks about that. It talks about the fact that when a lawsuit is filed before the end of funding, and that's what happened here, we filed our initial complaint two years before the Fiscal Responsibility Act. And where we've sought preliminary relief, which we did twice, once before the enactment of the Fiscal Responsibility Act, a court can exercise its equitable powers to direct the government to award funds. When you filed those, your complaint in 2021, and then the TROs in 2022, did you seek also a preliminary injunction? Did you seek an order that would be appealable, and the covered period was still ongoing? I'm sorry, Your Honor, I missed the very end of that. Apologies. My understanding is that you seek an order that would be appealable, and you sought a TRO twice. Yes. Okay. I'm asking, did you ever seek a preliminary injunction? Was there ever a ruling on a preliminary injunction while, before the covered period had expired? There was no, the initial request was for a TRO. There was no request for a preliminary injunction. The, the resolution of that initial request for relief was based on the fact that at the time the government had recovered funds, but it wasn't sure how it was going to distribute them. It's, it seems that the request that you're making would involve the court, the request that you're making would involve the court in really reallocating all of the expenditures, trying to claw back expenditures and then send them to people such as your clients. And wouldn't it have very broad implications, not just for you, but for anybody who would say they weren't properly prioritized by the SBA during the time that was now three or four years ago? It, it certainly is, we understand the gravity of the relief that we're asking for, but this is an instance where an agency has explicitly ignored and admittedly ignored and violated Congress's instructions with respect to how to prioritize applications. We aren't, for example, disagreeing with like a discretionary question, or a discretionary decision by the SBA to deal with our applications later. It, it violate, the SBA violated Congress's instructions, and that's pretty remarkable. So, our request for relief is also remarkable, we understand that, but these are remarkable circumstances. And I am nearly out of time, so I promise that I will just briefly conclude and ask the court to please vacate the decision and remand with instructions to allow us to conduct the jurisdictional discovery that we requested. Thank you. Thank you. And thank you for dealing with my questions. We understand. We all have our issues. Good afternoon, and may it please the court. Jeff Sandberg for the United States. The district court correctly dismissed the Third Amendment complaint for lack of jurisdiction and denied the request for jurisdictional discovery. I think your Honor's colloquies with my opposing colleague demonstrate that you have a good handle on the issues in the case. I do have just two clarifications I wanted to make, and then I would, aside from that, would welcome the court's questions. First is with regarding the early request for a TRO or PI. My understanding is that it was denominated as a request for a PI as well as a request for a TRO. But when it was denied, it was denied, the TRO was denied. That was in August 2022. So did the district judge rule on the request for the PI or not? I would regard that as inherent in the denial of, there was a motion for a PI. It was denied. So you think it could have been appealed then? I think so. The second point I wanted to clarify is with the city of Houston case from the D.C. circuit. That case actually draws a very clear distinction between two types of reasons why funds might not be available. One is if the appropriations were subject to an initial fiscal year cap where Congress says, you know, to be used during fiscal year 2018, to be used during fiscal year 2019. The other circumstance is where Congress rescinds the budget authority, rescinds the appropriated funds. And what city of Houston and the case that it cites, the Boulder case called Rochester, Piero Waters District versus EPA, what they say is where Congress rescinds the funds, they're gone. A court cannot try to appropriate funds so an agency can then obligate them. A court does have limited equitable authority where it's just a simple, a time expiration issue for the funds. Where a court can sort of hit pause on the expiration date for those funds during a current fiscal year. As long as, as my colleague has said, as long as you sued while the funds are still alive, a court can pause the expiration date. But if Congress permanently rescinds funds, then there's nothing that an agency or court can do to reappropriate them so that they could then be obligated. What is your view on the meeting of as of in the statute, right? So it says for the obligated balances, right? For each applicable appreciation as of the date of the enactment of this title. I think I heard from your friend on the other side that they're arguing, well, as of the date of the enactment, these weren't unobligated funds because they had been obligated to perhaps fraudulent parties. But they had indeed been unobligated funds at that time. Well, the point of the as of is to say any funds that had previously been obligated, Congress is not intending to try to take those back, right? Congress is not trying to divest funds from anybody who's already received it according to the proper orderly procedures before the agency. But as of the date of the enactment of this act, any unobligated funds associated with that program, any funds made available by Section 5003 of the American Rescue Plan Act are now permanently rescinded. And so if there were any funds that came back to the agency after that point, they would be funds that were made available by Section 5003. And we know from the statute they have now been permanently rescinded. When we understand the word permanently and as of to mean sort of going forward from this date, this is gone. This is part of the deal to extend the public debt limit was to take back all funds that haven't yet been paid out under some 80 programs. If there are no further questions. So the question, you know, moving back, the question about what should happen when it's acknowledged, at least as a result of a court case, that improper procedures were being followed by the SBA. And the people were not being, their applications were not being processed in the order in which they were actually filed. So these people filed their applications on the first day of the availability of the program. Some of them. Some of them. What, what remedy do they have? First, I just want to bracket the premise that there actually was no problem in how these orders and how the funds were distributed here. And I'm happy to explain why, if you're curious. Although the court below didn't reach the merits and we don't think this court should reach the merits either. But assuming that there had been some problem, the relief would be to come in and seek equitable relief and to seek a P.I. And if the P.I. is denied to appeal it to this court. So it's really a timing question that, that because of the subsequent legislation, the program has ended and nothing can be done. But if there had been a P.I. appeal and if this court or another court had addressed the district court's ruling, then there could have been relief for these people. That's right. If there had been a legal violation and it was, you know, the cover period hadn't expired and the funds hadn't been rescinded, they can pursue relief. But that's what the D.C. Circuit talks about in the city of Houston. And there's a Second Circuit case whose name is escaping me right now that also says, look, it's just if Congress pulls back the funds and then the program is over and there's nothing you can do, even if you would have had a valid claim at the time, you have to timely pursue your rights. And what happened in this case was a little bit odd is that we kept getting a newly amended complaint that would be fully briefed on a motion to dismiss. And then a new amended complaint would come in and that would be fully briefed. And we're up to the third amended complaint now. And I, you know, understand that the plaintiffs were trying to update their pleadings in light of developments that were happening in the real world. But if you believe that you timely, you know, or in urgently need equitable relief, you have to pursue it. Just to speak to the question of the processing of the applications, there's no dispute that SBA took up the applications for processing in the order in which they had been submitted according to the date stamp of when they were filed. But what happened is once you move to the processing stage, some applications are, you know, properly and perfectly completed and they match the tax receipts that the IRS has and you can sort of say, wave them through. There's no problems with this one. They filled it all out correctly and they don't seem to be seeking too much money according to what we know from what their tax returns for prior years are. And SBA made the choice that instead of holding up literally everyone else's applications as soon as you hit one bump in the road with somebody, they were going to go ahead and process people through, you know, they put people into processing in order. But if you have an application that is in, you know, in good shape in order to be approved, it approved it and it paid those out to get relief to people as soon as possible. And it is true that there are some applications that were later submitted, but then processed more quickly because they were more properly filled out that got paid before some others. But we regard that as consistent with the, you know, certainly the spirit of what Congress is trying to do with this emergency program, but also with the literal text of the statute. Can you discuss the applicability of the Cheney case? Yes, so the Cheney case is, recognizes that enforcement action is committed to agency discretion by law generally. The thrust of the plaintiff's complaint here, I think, is to seek enforcement by the agency against folks who they believe received the money either out of, in the wrong order or because they, you know, weren't eligible to begin with. The district court properly recognized that whether as a matter of, the district court conceived of that problem as a problem of standing, citing the recent Supreme Court decision in the United States versus Texas, where the Supreme Court said if your relief is essentially not legally cognizable, you don't have standing. And it said there that the committed agency's discretion by law problem was a problem of standing. This court could easily conceive of it as a problem of subject matter jurisdiction just as a matter of the statute itself, 701A2. I think we dropped a footnote in our brief citing the Madison Hughes case that makes that point. So, but we acknowledge that the enforcement dispute isn't necessarily dispositive of this whole case because they, some of the relief they were seeking, like to have their current applications processed, isn't enforcement per se. So, you know, the reason why our brief starts with the two, you know, mootness slash standing problems is because those are dispositive of the entire case. And so this court wouldn't need to reach the Cheney issues at all. Thank you. Any further questions? Thank you. Thank you. Thank you very much. Just a few points in clarification. I think just one of the unique features about this case that may separate it even perhaps from Houston is that there were fraudulent applications and there is money that is being recovered. But the SBA, excuse me, SBA is trying to recover. It's been told to recover. It has agreed to recover. So it wouldn't necessarily be we have to move around different appropriations. If that money comes back in, it can go back out to applicants who applied who are eligible entities. And that's part of, was part of the dispute that we were seeking jurisdictional discovery about. What does unobligated mean? What does it mean? Is something unobligated if it's been clawed back from a fraudulent applicant such that the rescission of the FRA doesn't apply? And that's what we were trying to find out. If you look at the discovery requests that we posited with our jurisdictional discovery motions, we were getting to the heart of that question. So there could be money. But we don't know because we didn't get discovery. My colleague talked about, you know, what we're saying about the processing issue with the applications. And perhaps I should have been more precise with my language during my initial argument. What the ARPA required was that the administrator of the SBA shall award grants to eligible entities in the process in which they were received. That's different from processing. So if a more complicated application was set aside and then later filed simpler applications of eligible entities were funded, that violates the ARPA. So your belief is that ARPA then required everything to stop until a very complicated application was addressed? That, that is what the sentence says. That is what Congress dictated. That would not really be compliant with the purposes of ARPA, which was to provide relief to people who were in need of relief during the urgency of the COVID period. It certainly would cause delay. Now, a way to think about that, though, Your Honor, is that unlike some of the pandemic relief programs that were enacted in the immediate aftermath of the pandemic in 2020, ARPA was enacted in May of 21. So there had been some time. I'm not, I'm not, certainly not diminishing, you know, the suffering of the restaurants that had incurred expenses and, you know, were essentially being run out of business by COVID. But it happened later. So perhaps there wasn't so much of a need for urgency as it was with some of the more immediately, you know, some of the more immediate programs that followed on the heels of the pandemic, like some of the, you know, PPP loans and differences in the different kinds of unemployment insurances that were available. And that's why Congress put the cover period into January of 2020. It recognized that time had passed and there were expenses that had been incurred. So thank you very much, Your Honors, for your time today. Thank you. Thank you both for your argument. The case will be submitted.